286 So.2d 747 (1973)
Verna Irene EARNEST
v.
Walter Morgan EARNEST.
No. 9498.
Court of Appeal of Louisiana, First Circuit.
November 13, 1973.
Rehearing Denied December 21, 1973.
Writ Refused March 1, 1974.
*748 Walton J. Barnes, II, Baton Rouge, for appellant.
Joel B. Dickinson, Baton Rouge, for appellee.
Before LOTTINGER, BLANCHE and CRAIN, JJ.
BLANCHE, Judge.
The plaintiff, Verna Irene Earnest, brought suit for divorce and the custody and support of her minor children born of her marriage to the defendant, Walter Morgan Earnest. The children are Samuel Earnest (hereinafter referred to as "Sam") and Walter Earnest, III, and the plaintiff stated at the time of trial on July 12, 1972, that Sam was age five and Walter, III, was age four. The defendant filed a reconventional demand asking for the custody of the older child Sam. The trial judge granted plaintiff a divorce but split the custody of the children, awarding the custody of Sam to his father and Walter, III, to his mother. As to child support, the judgment was silent.
The plaintiff has appealed and assigns as error the granting of the custody of the minor child Sam to his father and the failure to award plaintiff alimony for the support of her minor children. The defendant has neither appealed nor answered the appeal.
Plaintiff and her husband, while living in Oak Grove, Louisiana, separated on or about April 18 or 19, 1970, after an argument. At the time of the separation the defendant took the older child Sam with him to the home of his mother who also lived in Oak Grove. Because plaintiff was unable to obtain Sam from her husband, she left with the other child, Walter, III (called "Hoss" by his father and "Duke" by his mother), to reside with her mother in Baton Rouge. The evidence reveals that except for that time of their marriage when the defendant was in the armed services the couple was in poor financial condition, having at one time found it necessary to purchase food stamps for food. After arriving in Baton Rouge, plaintiff was indeed in necessitous circumstances, applying for and receiving welfare assistance. As a condition for receipt of welfare assistance, plaintiff was forced to file criminal nonsupport charges against the defendant for his failure to support the child that she had in her physical custody. After defendant pled guilty to the charge, he was placed on probation but eventually fell behind in the support payments of $50 per month that he had been ordered to pay for the support of the child Walter, III. These arrearages were later cancelled by the court as a result of a physical disability which prevented defendant from working. Defendant testified that it was only a short time before trial that he was able to work.
The evidence reveals persistency on plaintiff's part to obtain the custody of the child Sam. She testified to her unsuccessful efforts to obtain the services of a lawyer for that purpose in the defendant's home town. She also testified that she attempted to employ a lawyer in Denham Springs, Louisiana, but could not afford to pay the legal fees. Thereafter, on two different ocasions she made application to the Legal Aid Society in Baton Rouge for this purpose. The first application was made on June 2, 1970, and the second on October 27, 1971. Neither of these applications was processed, and the Director of the Legal Aid Society was unable to state a reason for their not being processed. She further testified that a lawyer advised her that if she could obtain physical possession of the child, she would have a better chance of obtaining custody. As a result *749 of this advice, she and her sister went to Oak Grove for that purpose. There she found Sam at a baby-sitter's home where she forceably took him to the home of another friend in Oak Grove. However, before she could "escape" she was apprehended by the defendant's stepfather who blocked her car in the driveway of her friend's home with his truck. The stepfather was unsuccessful in his initial attempts to obtain the child from plaintiff, but as he stated, he knew she would have to come out some time as he had blocked her car with his truck. Arriving on the scene later was a deputy sheriff, who, as the testimony showed, was an old friend of the defendant's stepfather. He purportedly came on the scene just to see that there was no trouble. Defendant finally arrived on the scene and accosted the plaintiff, telling her she was lucky she had not been successful in getting away with Sam as he would have beat her. The plaintiff claims that the defendant's threats were of a graver nature and that he actually threatened to kill her. The deputy sheriff testified that he heard no such threats. In any event, this confrontation ended with the mother surrendering the child, who was purportedly screaming and crying to go to defendant's stepfather. After taking possession of Sam, the stepfather then suggested that plaintiff and defendant repair to his home to talk the matter over like two sensible people. It was there under a shade tree in the yard that the defendant claims an agreement was reached by him with the plaintiff whereby he was to keep Sam and she was to keep Walter, III. That such an agreement was made is corroborated by the defendant's mother and stepfather, and although they did not participate in any of the conversations leading up to the purported agreement, they stated they overheard what was said. Plaintiff denied that such an agreement was made, testifying that she told defendant the next time she attempted to get her child it would be legally. This suit for divorce and custody was filed by her in a legal effort to obtain the custody of Sam and it has now found its way to this Court.
We conclude that plaintiff has never abandoned any right that she may have had to the custody of this child either by agreement or otherwise.
Defendant sought to prove that plaintiff was an unfit mother and was not entitled to have the custody of the child Sam. There was a feeble insinuation by the defendant and his mother that plaintiff deliberately burned Sam with a cigarette on two different occasions in a fit of anger. This conclusion is based upon the fact of the defendant's mother having noticed a burn on Sam's body and of Sam's purported hearsay statement to explain it, "Mother was mad." This was denied by plaintiff and in our opinion the proof of such conduct on the part of plaintiff failed. There is also evidence concerning plaintiff's housekeeping habits which were described by defendant's mother as "slothful." This witness further testified that Sam was not willing to go with his mother and would ask them not to let his mother take him and would cry when he saw her. She also testified that Sam was definitely afraid of his mother. Her other testimony reflects that plaintiff would stay in bed in the morning while her two year old child would have to get up to fix his own breakfast. All of these allegations were denied by plaintiff. To explain how plaintiff could be qualified for the custody of one child and not the other, there are charges but no proof that she favored the younger child Walter, III.
We conclude that there is an absolute failure of proof to show any unfitness, either morally, mentally or otherwise, on the part of the mother in order to deprive her of the right to the custody of her child of tender years.
We are also convinced that both parents are equal in their ability to provide Sam with a good, comfortable and moral *750 home. Sam is loved by both of his parents. He is also loved by the defendant's wife,[1] defendant's stepfather and mother. Defendant and his present wife can furnish Sam with both a mother and father image. While plaintiff has not remarried, she and her family are a closeknit family and live together in a modest but modern brick home in Baton Rouge. The defendant and his wife live with his brother in a trailer on a three-acre plot. The stepfather, who furnishes a grandfather image to Sam, has given him a goat and a horse. Sam has the disadvantage of not being able to enjoy the full benefit of the companionship of his brother. He is being reared in a different environment and possibly under different economic and social conditions.
The applicable legal principles are as follows:
(1) "The paramount consideration in determining to whom custody should be granted is always the welfare of the children. Drouin v. Hildenbrand, 235 La. 810, 105 So.2d 532 (1958) and jurisprudence therein cited; see also Moosa v. Abdalla, 248 La. 344, 178 So.2d 273." [Fulco v. Fulco, 259 La. 1122, 254 So.2d 603, 605 (1971)]
(2) "The general rule is that it is in the best interest of the children of the marriage to grant custody to the mother, especially when they are of tender years. Such paramount right of the mother to custody should not be denied unless she is morally unfit or otherwise unsuitable, and it is only in exceptional cases that the better interest of the children is served by changing their custody from the mother to the father. Messner v. Messner, 240 La. 252, 122 So.2d 90 (1960); Drouin v. Hildenbrand, 235 La. 810, 105 So.2d 532 (1958); Boatner v. Boatner, 235 La. 1, 102 So.2d 472 (1958); Tullier v. Tullier, 140 So.2d 916 (La.App.1962) * * *."[2] [Fulco v. Fulco, supra, 254 So.2d at 605]
(3) "The separation of children of a family, though sometimes necessary, is a custodial disposition that courts seek to avoid. Normally, the welfare of these children is best served by leaving them together, so they can have the full benefit of companionship and affection. When feasible, a court should shape its orders to maintain family solidarity. See Rose v. Rose, La.App., 177 So.2d 659." [Tiffee v. Tiffee, 254 La. 381, 223 So.2d 840, 843 (1969)]
(4) "Upon appellate review, the determination of the trial judge in child custody matters is entitled to great weight. He is in a better position to evaluate the best interests of the children from his total overview of the conduct and character of the parties and the children and of community standards. His discretion on the issue will not be disturbed on review in the absence of a clear showing of abuse thereof. Messner v. Messner, 240 La. 252, 122 So.2d 90 (1960); Salley v. Salley, 238 La. 691, 116 So.2d 296 (1959); Decker v. Landry, 227 La. 603, 80 So.2d 91 (1955); Guillory v. Guillory, 221 La. 374, 59 So.2d 424 (1952)." [Fulco v. Fulco, supra, 254 So.2d at 605, 606]
We admit the issue concerning the best interest of the child is not easily decided. Additionally, we have not seen the parents involved in this litigation. Since we are certain that Sam is getting along quite well in the custody of his father, we are reticent to uproot the child and move him from a place where he is happy and contented to another place where he must *751 make adjustments but our reticence must bend to the law and evidence.
Sam is a child of tender years, and his mother is capable in every way of having the custody of her two minor children. She has never abandoned Sam and has always sought his custody since her separation from the defendant. As a matter of law in an initial determination of custody, it is in the best interest of the children of tender years to grant their custody to the mother, and it is only in exceptional circumstances that their custody should be denied to her. No such circumstances exist in the instant case, save the fact that Sam has been with his father since his parents' separation and has been doing quite well.[3]
We are also greatly persuaded by the fact that the welfare of both children is best served by their being reared together. In Tiffee v. Tiffee, cited supra, the mother had the legal custody of both children of the marriage but the father had the actual custody of one of the children from the time the parties separated in September of 1965 until the Supreme Court decision in June of 1969. The trial court and the appellate court concluded that it was in the best interest of the child whose custody had been residing with the father to place the custody of the child in the father. The Supreme Court reversed, stating:
"The separation of children of a family, though sometimes necessary, is a custodial disposition that courts seek to avoid. * * * When feasible, a court should shape its orders to maintain family solidarity." [Tiffee v. Tiffee, 223 So.2d at 843]
Although we agree that the decision of a trial judge in child custody matters is entitled to great weight, we think the trial judge erred in both law and fact in failing to place the custody of the child Sam with his mother, and we, accordingly, reverse that judgment.
The foregoing considered, it is ordered, adjudged and decreed that there be judgment herein awarding the care, custody and control of the minor child, Samuel Earnest, to his mother, plaintiff, Verna Irene Earnest, subject to the right of reasonable visitation on behalf of the defendant, Walter Morgan Earnest. It is further ordered, adjudged and decreed that the case be remanded for the purpose of determining the amount of child support the defendant should be required to pay unto the plaintiff for the support of his minor children, Samuel Earnest and Walter Earnest, III. All costs of these proceedings are to be borne by the defendant.
Reversed and remanded.
NOTES
[1] Defendant, after separating from his wife, obtained a divorce in Arkansas and thereafter remarried.
[2] See Justice Barham's Dissent in Estes v. Estes, 261 La. 20, 258 So.2d 857, 861 (1972), where he observes that the above quote "speaks of the paramount right of the mother in the cases where change of custody is sought from the mother to the father," and is thus inapplicable in cases where custoday has not been determined by the court.
[3] For examples of cases where children were well cared for by the custodial parent but their custody was changed by the court, see Estes v. Estes, supra, where the Louisiana Supreme Court changed custody from the father to the mother when the children had been with the father for over three years, and Nieto v. Nieto, 276 So.2d 362 (La.App.4th Cir. 1973), where the appellate court changed custody from the father to the mother when a child had been with the father two years.